ORIGINAL

AO 93 (Rev. 12/09) Search and Seizure Warrant  (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. |
| 13668 Lakeland Road Whittier, California 90605 | ) ) ) | |

**15 - 17 8 9 M**

FILED
OCT 13 PM 1:49

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Central_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

   See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

   See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.  Such affidavit(s) or testimony are incorporated herein by reference and attached hereto. [

   **YOU ARE COMMANDED** to execute this warrant on or before     14 days from the date of its issuance
                                                                                                          *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.     ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.
                           *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*  ☐ for _____ days *(not to exceed 30)*.

                                        ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   9/28/15  4:15 pm                    *Alicia G. Rosenberg*
                                                                                    *Judge's signature*

City and state:   California, California                    Alicia G. Rosenberg, U.S. Magistrate Judge
                                                                                    *Printed name and title*

AUSA: dpk

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed:<br>9/30/15 @ 6:05 AM | Copy of warrant and inventory left with:<br>Antonio Arellano |
| Inventory made in the presence of :<br>SA Leroy Sheltn | | |

Inventory of the property taken and name of any person(s) seized:
[Please provide a description that would be sufficient to demonstrate that the items seized fall within the items authorized to be seized pursuant to the warrant (e.g., type of documents, as opposed to "miscellaneous documents") as well as the approximate volume of any documents seized (e.g., number of boxes). If reference is made to an attached description of property, specify the number of pages to the attachment and any case number appearing thereon.]

1. Desktop computer

2. Laptop computer

3. Business Articles of Incorporation

---

**Certification** (by officer present during the execution of the warrant)

I declare under penalty of perjury that I am an officer who executed this warrant and that this inventory is correct and was returned along with the original warrant to the designated judge through a filing with the Clerk's Office.

Date:  10/2/15

_Executing officer's signature_

Leroy Sheltn / Special Agent
_Printed name and title_

## ATTACHMENT A

## DESCRIPTION OF THE PREMISES TO BE SEARCHED

The premises to be searched is <u>13668 Lakeland Rd, Whittier, CA 90605</u>, including any garages, storage units, or outbuildings at that address ("the **Subject Premises**").  The **Subject Premises** is more particularly described as a single-story family residence made up of wood and stucco construction.  The exterior is pink in color and the roofing is brown composite asphalt shingles.  The **Subject Premises** has a detached two-car garage with the same exterior color and roofing.  The numeric address "13668" of the home is displayed on home in large black numbers and is positioned to the right of the front door.  The home address is visible from the street.

## ATTACHMENT B

### ITEMS TO BE SEIZED

The items to be seized are evidence, contraband, fruits or instrumentalities of violations of 18 U.S.C. § 1030, including 1030(a)(7) (extortion in connection with computers under the Computer Fraud and Abuse Act):

     1.    All documents, records, or programs, applications, or materials, regarding or referencing:

        a.    Unauthorized access to and/or damage to Company A computers systems, including unauthorized access to Company A computer servers;

        b.    Extortion of funds from Company A, receipt of proceeds from the scheme, or transfer of proceeds from the scheme;

        c.    The identities or locations of the participants of the scheme; and

        d.    Any decryption key or password that could be used to conceal evidence relevant to the above criminal violations;

     2.    All digital device containing information regarding or referencing:

a.      Unauthorized access to and/or damage to Company A computers systems, including unauthorized access to Company A computer servers;

b.      Items relating to extortion of funds from Company A, receipt of proceeds from the scheme, or transfer of proceeds from the scheme;

c.      Items relating to the identities or locations of the participants of the scheme; and

d.      Any decryption key or password that could be used to conceal evidence relevant to the above criminal violations;

3.      No more than 15 documents, records, or items showing ownership, dominion or control over the premises to be searched.

4.      As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

5.      As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as

modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## SEARCH PROCEDURE FOR DIGITAL DEVICES

1.     In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.     Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 60 days from the date of execution of the warrant.  If additional time is needed, the government may seek an extension of this time period from the Court on or before the date by which the search was to have been completed.

b.     The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.     The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover

deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

      ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

      c.    When searching a digital device pursuant to the specific search protocols selected, the search team shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

      d.    If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

      e.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

      f.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      g.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the

government may retain forensic copies of the digital device but may not access them (after the time for searching the device has expired) absent further court order.

h.    The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending). Otherwise, the government must return the device.

i.    Notwithstanding the above, after the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

2.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

    d.      Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

    e.      Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

    f.      Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

    g.      Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

    h.      The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Andrew Innocenti, being duly sworn, state as follows:

### INTRODUCTION

1.      I am a Special Agent of the Federal Bureau of Investigation and am assigned to the Chicago Field Office. I have been employed as a Special Agent with the FBI since August 2015. As a Special Agent, I am charged with investigating possible violations of federal criminal law, including computer crimes, in violation of 1030(a)(7) (extortion in connection with computers under the Computer Fraud and Abuse Act). I have spent approximately one month assigned to cyber crime squad at the FBI and have gained experience in the investigation of computer cries during this time.

2.      This affidavit is made in support of an application for a warrant to search the residential address 13668 Lakeland Rd, Whittier, CA 90605, including any garages, storage units, or out-buildings at that address ("**the Subject Premises**"), which is further described in the following paragraphs and in Attachment A. As set forth herein, there is probable cause to believe that at **the Subject Premises** there exists evidence, fruits, or instrumentalities, as specified below in Attachment B (incorporated by reference as fully set forth herein) of violations of Title 18, United States Code, § 1030(a)(7) (the "**Subject Offense**").

1

3.    The statements in this affidavit are based on my personal knowledge and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are sufficient to establish probable cause to believe that evidence and instrumentalities concerning violations of the **Subject Offense** are located at **the Subject Premises**.

### PREMISES TO BE SEARCH

4.    The premises to be searched is <u>13668 Lakeland Rd, Whittier, CA 90605</u>, including any garages, storage units, or out-buildings at that address ("the **Subject Premises** "). The **Subject Premises** is more particularly described as a single-story family residence made up of wood and stucco construction. The exterior is pink in color and the roofing is brown composite asphalt shingles. The **Subject Premises** has a detached two-car garage with the same exterior color and roofing. The numeric address "13668" of the home is displayed on home in large black numbers and is positioned to the right of the front door. The home address is visible from the street.

## DEFINITIONS

5.    I know from my training and experience as an FBI Special Agent that the following definitions apply to the activity discussed in this affidavit:

a.    *IP Address*: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic to and from that computer may be properly directed from its source to its destination.

b.    *Static IP address:* A static IP address is an IP address that is dedicated to a particular entity for a long term period of time. Static IP addresses are typically associated with business, government, and other organizational Internet usage for services such as web site hosting and email services.

c.    *Dynamic IP address*: A dynamic IP address is an IP address that is assigned to a computer/computing device in an on-demand basis. A computer assigned a particular IP address dynamically typically retains usage of that IP address for a limited period of time. The usage of dynamic IP addresses is commonly found in Internet service provided to residential customers.

3

d.    *Server*: A server is a computer that provides services to other computers. Examples include web servers, which provide content to web browsers, and email servers, which act as a post office to send and receive email messages.

e.    *Domain Name*: A domain name identifies a computer or group of computers on the Internet, and corresponds to one or more IP addresses assigned to those computers. Domain names are typically strings of alphanumeric characters, with each "level" of the domain delimited by a period (*e.g.*, Computer.networklevel1.networklevel2.com). Domain names are used to make finding and accessing network resources easier and to limit the need for end-users to know specific IP addresses assigned to a particular resource (*e.g.*, the IP address for ABC Company's web server may be 10.47.53.126, while the corresponding domain name an end-user would have to know might be only "www.abccompany.com").

f.    *Domain Name Service (DNS)*: A protocol utilized by computers to correlate a domain name to an IP address and that provides a mechanism to lookup said information.

g.    *Mail Exchange (MX) record*: A record type used by the DNS protocol to correlate the IP address of a server responsible for email for a given domain with that domain name. MX records are utilized to identify the correct email server for a given domain so that emails can be routed correctly.

4

(*e.g.*, The MX record for ABC Company's domain, abccompany.com, might reflect the IP address 10.47.53.127 as the IP address of the email server for the domain, and an email server for another domain would then direct email for abccompany.com to the IP address 10.47.53.127).

      h.   *Email Header*: An email header is information included with an email message which reflects details as to the route the email followed between the point it was sent and the point it was received. Information included in the email header can include details regarding the email servers which sent, transferred, and received the associated email message.

## FACTS SUPPORTING PROBABLE CAUSE

6.    The FBI is conducting an investigation into unauthorized access by one or more individuals to the protected computer systems of a computer software company located in the Chicago area ("Company A") in violation of 18 U.S.C. § 1030 (the Computer Fraud and Abuse Act).

7.    As further described below, a series of communications were received by Company A between on or about May 12, 2015, and on or about May 21, 2015, which indicated that an individual named Stefan Stojanovic had gained unauthorized access to the protected computer systems of Company A and demanded payment from Company A while threatening to

harm Company A computer systems and to disclose confidential information obtained from Company A computer systems.

8.    Specifically, based on reviewing the pertinent reports and communicating with the FBI agents involved in the interview, I know that on or about May 20, 2015, and on or about May 26, 2015, an FBI agent interviewed Individual A[1], a Company A employee, regarding the unauthorized access and threatening communications. Individual A provided the following information:

a.    Company A's primary business is the provision of software utilized by companies in the transportation sector. Company A also provides services to host the servers of a portion of its clients. Company A also has authorized access to many of its clients' servers that are not directly hosted by Company A in order to maintain the Company A software. The collective servers to which Company A has access contain personal information for between 50,000 and 100,000 individuals.

b.    On or about May 12, 2015, Individual A received an email message from the email account srbincar@gmail.com which indicated that it was from someone who identified himself as Stefan Stojanovic and in which

---

[1]  Individual A is voluntarily cooperating with law enforcement and has not been promised anything in exchange for Individual A's cooperation nor has Individual A received any benefit for the information thus far. Individual A has an arrest for domestic violence in 2007 but it is not clear if that arrest resulted in a conviction.

Stojanovic claimed to have gained unauthorized access to Company A computers. Stojanovic included a list of usernames and passwords in the email as well as a screenshot of a computer screen. Individual A advised that the usernames and passwords belonged to employees of Company A and that the screenshot appeared to be of someone logged into a Company A computer server. In the email, Stojanovic also claimed to work for Love Freightways, Inc ("Love Freightways"). Individual A advised that Love Freightways had just became a customer of Company A's in the last several months.

    c.    That same day, Individual A sent a response email back to the email account srbincar@gmail.com indicating an interest in discussing the matter further. Individual A stated he did this to attempt to draw out more information from Stojanovic. In a subsequent email exchange, Individual A and Stojanovic agreed to discuss matters further via Skype.[2]

    d.    Between approximately on or about May 13, 2015, and on or about May 21, 2015, Individual A and Stojanovic engaged in a series of Skype instant message communications in which Stojanovic discussed gaining unauthorized access to Company A's computer systems and in which Stojanovic requested payment to prevent Stojanovic from disclosing Company A customer information and to allegedly fix the problem.

---

[2] I am aware from my experience that Skype is an Internet-based communication service which offers a variety of communication options including telephone voice calls, video chat, and instant messaging.

e.    Individual A and Stojanovic agreed to two payments of $10,000 each totaling $20,000, but Stojanovic changed his mind claiming Stojanovic's partners had not agreed to that total and indicating that the price would be $50,000 instead. Individual A then negotiated the price down to $40,000. Individual A advised that he/she felt compelled to pay the money to Stojanovic to protect the data and computer servers of Company A's customers from being released or harmed by Stojanovic.

f.    On or about May 20, 2015, Individual A received an email from the email account srbincar@gmail.com in which Stojanovic requested payment be made via a cashier's check and specified the name of Marko Stankovic as the name to which the check was to be payable. Stojanovic also stated that he would provide the bank account number to which the cashier's check was to be deposited when a photo of the cashier's check was sent to him.

g.    On or about May 20, 2015, Individual A obtained a $40,000 cashier's check payable to the name of Marko Stankovic, and Individual A sent a photo of the cashier's check to the email account srbincar@gmail.com.

h.    On or about May 20, 2015, Individual A and Stojanovic engaged in a Skype instant message conversation in which Individual A and Stojanovic agreed that the funds would be deposited the following morning as the bank was now closed. Stojanovic advised via instant message that

8

Stojanovic would provide the bank account number to which the funds were deposited once Individual A was at the bank.

i.   On or about May 21, 2015, Individual A sent a Skype instant message to Stojanovic and notified him that Individual A was at the bank. Stojanovic responded via Skype instant message with the bank account number to which the cashier's check was to be deposited. Stojanovic also requested that a copy of the receipt of the deposit be sent to him. Individual A followed the instructions and deposited the cashier's check to the specified bank account number. Individual A then sent a photograph of the receipt of the deposit to the email account srbincar@gmail.com.

9.   Individual A provided an FBI agent a copy of an email message received on or about May 12, 2015 at 3:13 PM CDT from srbincar@gmail.com to Individual A's email account which listed the name "Stefan Stojanovic" next to srbincar@gmail.com with a subject "Security vulnerable on [Company A] server." The email stated in part:

> "My name is Stefan and i'm[3] working as IT Director of Love Freightways Inc. Love Freightways Inc. is using [Company A Software] and when I dont work for them I'm serching for vulnerability on websites, servers, softwares etc. as a freelancer. This email is not realted to my company, and they dont want to have anything with this. I find a security vulnerable on ur servers, and I'm looking to report this to you guys so you can fix this and keep ur servers safe from malicious

[3] All typographical errors in the quoted language from emails or Skype chats are in the original text of the communication. Due to the number of typographical errors, a [sic] is it be considered in place after each error.

9

hackers. This is proof of hacking, and i hope you will contact me so I can give you more informations how to fix this."

Immediately following this sentence were thirteen pairs of usernames and passwords and a screenshot of a computer screen which had an icon on the desktop that showed Company A software to be installed on it. As previously described in this affidavit, Individual A identified these usernames and passwords as being of Company A employees and the screenshot to be reflective of someone apparently logged onto a Company A server.

10.    From my review of the materials and reports of other FBI agents, I know that Individual A has provided an FBI agent with a copy of an email message dated May 20, 2015 at 3:40 PM CDT from srbincar@gmail.com to Individual A's email account with the name "Stefan Stojanovic" listed with the email address srbincar@gmail.com which stated "Ok so then put name 'Marko Stankovic,' when you send picture of check i will send you bank account."

11.    Individual A has also provided an FBI agent with a copy of Individual A's Skype instant message conversations between Individual A and the Skype user ID e.katarina.velika, which Individual A identified as being the Skype user ID which Stojanovic used to contact Individual A. The

Skype display name[4] which appeared with these instant messages from e.katarina.velika began with non-english characters and ended with "Stefan".

        a.    A Skype instant message conversation from on or about May 13, 2015, stated in part the following:

**e.katarina.velika**: "Hi [Individual A]"

**[Individual A]**: "Hi", "How you doing"

**e.katarina.velika**: "so far so good", "how about you?"

**[Individual A]**: "pretty good", "considering we had a server hacked into", "albeit old one, still a big issue"

**e.katarina.velika**: "True, well i'm here to make developers and server administrator busy" . . . [5]

**[Individual A]**: "ok, so let's do this", "you got into that one server and gained full access", "did you get into any other ones?"

**e.katarina.velika**: "Not one, all of your servers"

**[Individual A]**: "which other one?"

**e.katarina.velika**: "I'm not sure, I'm not rly interested in server I got access", "Just get one as proof"

    ...

**e.katarina.velika**: "So you figured that you are not 1st company I did this to."

---

[4] I have been advised by FBI personnel experienced with Skype that a Skype display name is the name which appears when a call or instant message is sent to someone via Skype.

[5] For brevity, the complete Skype conversation is not fully detailed here and ". . ." is utilized to denote where components of the conversation are not included.

[Individual A]: "yeah", "to be honest with you", "I'm not surprised, I'm not happy with our current set up at all"

e.katarina.velika: "I ask for money for fix i think you figured that". "Yeha you guys can do better"

. . .

e.katarina.velika: File sent - keys.xlsx[6]

e.katarina.velika: "If you like you can search for password. :'D"

...

[Individual A]: "so", "what are you interested in, are you looking for full-time job or just security testing"

e.katarina.velika: "No I dont want job i can get job in Google if I want to." But i'm happy with my position", "i'm doing this for a few resons, fun, practice and some extra money", So what do u think how much this 'bounty hunt' is worth?"

[Individual A]: "i'm more interested in something more long term"

e.katarina.velika: "Ok then", "Say price."

[Individual A]: "I don't know", "the price", "since I don't know how much something like this can be", "here's what I want to do", "i need to know how much would be it to pen-test it after we put all servers onto domain", "fully test it, inside and outside", "and not just that", "but entire network", "or actually, at least we can start with that and then move on"

e.katarina.velika: "Huh, that is 2 weeks job I think", "I hacked your servers in few hours"

---

[6] Individual A advised that keys.xlsx, which was transmitted via the Skype instant message was found to contain a list of usernames and passwords for accessing various Company A computer systems. An FBI agent has been provided a copy of this file which contains a list of over 800 username and password entries.

[Individual A]: "so, how much is 2 weeks ?", "I know how much is my 2 weeks but not yours"

e.katarina.velika: "Ok so everything with this bug 150 000$", "Price of new truck and price of new woth IT guy"

[Individual A]: "what is everything"

e.katarina.velika: "Pen-testing, few tips, fix, new website (this one sux – sorry), and this bug"

...

e.katarina.velika: "So do we have deal?", "And when we can start?"

[Individual A]: "ok, website on a side", "I need time", "to run it by my partners", "and need to think how to wrap it up for them", "before they call fbi heh", "they're Americans, hard for them to understand", "plus non-technical"

e.katarina.velika: "Just told them dat I had chance to delete everything", They will end sued or things like that".

[Individual A]: "yeah, I understand", "we'll need some time, i'll let you know in which direction we want to go"

e.katarina.velika: "Wll just this bug is worth 50k $", "So with or without of job I expect money"

[Individual A]: "that's a lot of money"

e.katarina.velika: "This is big bug"

[Individual A]: "even google doesn't pay 50k", "but I understand your point"

e.katarina.velika: "Yeha they pay 1m", "Last company I did was 70k"

[Individual A]: "how would you expect your payment?"

13

**e.katarina.velika**: "However you guys want", "I have bank accounts everywhere", "off-shore, US, EU..."

. . .

**e.katarina.velika**: "So you cant make nothing before monday?"

**[Individual A]**: "not before i talk to them[7]", "it really depends", "whether they want to do long term"

. . .

**[Individual A]**: "but i do understand that this bug will be immediate payment", "have another meeting in 30 minutes, gotta leave the office", "send me that CV/resume[8]".

**e.katarina.velika**: "Ok, that is fer, dont usually w8 few days for something like this", "But i will make exception cuz my coworkers like you guys and ur software"

      b.    A Skype instant message conversation from on or about

May 18, 2015, stated in part the following:[9]

**e.katarina.velika:** "I am sorry, but the price for that breach is 50,000.", "I understand that the number may be big.", "But the technical and legal teams say that the price is 50,000 and that they cannot go below that", "Simply put, the nature of a breach is such that it could lead to various misuses"

**[Individual A]**: "But it was 20k 10 minutes ago"

---

[7] From the context of the instant message conversation prior to this statement, I believe that "them" is a reference by Individual A to the business partners at Company A which Individual A had previously told Stojanovic about.

[8] Previously in the chat session, Individual A had requested that Stojanovic send a resume outlining his skills and references.

[9] In the May 18th conversation, both parties switched from writing in English to a language which Individual A identified as being Serbian. The translated instant messages listed here reflect the preliminary translation performed by an FBI linguist. All of the other instant message conversations detailed in this affidavit were written in English.

14

**e.katarina.velika**: "Yes it was okay for me, not for my team.", "I am not familiar with legal things nor the American law", "which says that the personal information of employees or entire companies must not be in the open"

**[Individual A]**: "Well it is not in the open"

**e.katarina.velika**: "With this breach it is", "All the information of the entered [two specific job categories of Company A customers' employees] is in the open", "Likewise, someone else can also take it", "and can publish it somewhere, unless this is done"

      c.    A Skype instant message conversation from on or about May 20, 2015, stated in part the following:

**e.katarina.velika**: "I sent you email." [10]

**[Individual A]**: "In the bank", "I'll scan it shortly"

**e.katarina.velika**: "Ok let me know when ur done."

**[Individual A]**: "Sent"

**e.katarina.velika**: "Ok go to Chase Bank", "Message me when ur there"

**[Individual A]**: "Traffic is bad", "Not sure I'll make it"

**e.katarina.velika**: "Banks are working till 5", "You have 25 min"

**[Individual A]**: "Exactly", "Says 15 minutes for closest but im not moving"

---

[10] According to the Skype logs obtained from Individual A, this instant message was received on May 20, 2015 at approximately 4:17 PM CDT. As stated in paragraph nine, an email received by Individual A from srbincar@gmail.com on May 20, 2015 at 3:40 PM CDT specified the name of Marko Stankovic as the name to appear on the cashier's check.

**e.katarina.velika**: "Try to do it today", "You still have 15 min."

...

**[Individual A]**: "I wish you sent me that sooner", "I wouldn't be late", "Name"

**e.katarina.velika**: "I had to talk to my team about this", "This process is delicate to them."

**[Individual A]**: "You'll have your money tomorrow"

**e.katarina.velika**: "Try to go in bank, maybe they let you in."

. . .

**[Individual A]**: "She closed, manager didn't answer tl", "Told me to scan and deposit", "Overnight"

**e.katarina.velika**: "Tomorrow morning be in bank."

**[Individual A]**: "Yes"

**e.katarina.velika**: "Gove me phone number I will call you in 9AM by ur time", "To give you information about account."

    d.    A Skype instant message conversation from on or about

May 21, 2015, stated in part the following:

**[Individual A]**: "Im here, let me know when ready"

**e.katarina.velika**: "I'm ready", Are you in bank?"

**[Individual A]**: "Walking in", "Im here with deposit slip"

**e.katarina.velika**: "Ok I will send you account number", "A moment", "632655523", "Marko Stankovic", "CHASE Bank", "When you make payment send me picture of recive"

**[Individual A]**: "Ok, going to deposit"

16

**e.katarina.velika**: "When money show up on account and everything move well you can pick time and date for bug fix."

**[Individual A]**: "Deposit is done"

**e.katarina.velika**: "Ok take picture and send me to email so I can forward to team."

**[Individual A]**: "I emailed it"[11], "Also, no need for fix", "Just please disconnect from our servers and any of our customers", "And lets not talk to eqch other again"

**e.katarina.velika**: "Allright", "I send to my team to check" [12], "Ok they said everything is fine,"[13] "If you change ur mind about fix, email me anytime"

**[Individual A]**: "Just want this to end"

**e.katarina.velika**: "Yeha it's bad.", "Have any other company to recommend to us?" [A laughing face emoticon[14] appeared at the end of this message.]

12.    Based on my communications with the agents involved in obtaining and executing the warrant and review of pertinent reports, I know that on or about June 8, 2015, a search warrant was issued in the Northern District of Illinois by the Honorable Magistrate Judge Jeffrey T. Gilbert for

---

[11]  According to the Skype logs obtained from Individual A, this instant message was sent by Individual A on or about May 21, 2015 at approximately 9:11 AM CDT.
[12]  According to the Skype logs obtained from Individual A, this instant message was sent by Stojanovic on or about May 21, 2015 at approximately 9:13 AM CDT.

[13]  According to the Skype logs obtained from Individual A, this instant message was sent by Stojanovic on or about May 21, 2015 at approximately 9:16 AM CDT.

[14]  I am aware from my experience that an "emoticon" is a graphic representation of a facial expression utilized in various forms of online communications designed to convey emotional expression such as happy, sad, angry, etc...

the email account srbincar@gmail.com.  The FBI has received the search

warrant results from Google for the email account srbincar@gmail.com, which

an FBI agent has reviewed.  The FBI agent found a significant amount of

material relating to the **Subject Offense**, including copies of the previously

described email communications between Stefan Stojanovic and Individual A.

13.    One of the emails received by the email account

srbincar@gmail.com from Individual A was received on or about May 21, 2015

at 9:11 AM CDT.  This email contained a digital picture with the filename

"20150521_090930.jpg," which is a photograph of a JPMorgan Chase Bank,

N.A. receipt dated May 21, 2015 at 9:08 AM and that reflects $40,000

deposited to an account number ending in 5523 with the availability of

$35,000 of the deposited amount delayed until June 2, 2015.[15]

14.    The email account srbincar@gmail.com also was found to contain

an email sent on or about May 21, 2015 at 9:13 AM CDT from Stefan

Stojanovic using the email address it@lovefreightways.com[16] to "nemo Lovre"

---

[15]   As stated previously, on or about May 21, 2015, Individual A received
instructions via Skype to deposit the $40,000 cashier's check to Chase bank account
#632655523.

[16]   I am aware that Google provides a service by which an individual can associate a
non-gmail email address with his/her Google email account and send email
messages using the Google email account that appear to come from the non-gmail
associated email address.  Further, the search of the email account
srbincar@gmail.com also found an email received on or about December 26, 2014
from Google which indicated that "it@lovefreightways.com" has been added as an
email address for the Google account srbincar@gmail.com.

at the email address nemo@lovefreightways.com. The email had attached the digital picture with the filename "20150521_090930.jpg" described in the prior paragraph. [17]

15.     The email account srbincar@gmail.com was also found to contain an email sent on or about June 3, 2015 from Stefan Stojanovic using the email address it@lovefreightways.com to "nemo Lovre" at the email address nemo@lovefreightways.com which stated:

> "Dear Mr. [Individual A's first name]
>> As we agree I'm sending you information about your server security vulnerability. I want to let you know that I didn't make any actions till I have your full permission. Server is still vulnerable and as we agree when you give me permission I will fix it. If you don't want from me to make any action just let me know. Of course as we agreed I didn't touch any of your customers personal data or any server settings.
>> Regards,
>> Stefan."

16.     At the conclusion of the above content was additional text in a language which an FBI linguist identified as being Serbo-Croatian. A preliminary translation of this text by an FBI linguist was as follows:

> "Is it okay to send him this? I will also later add the technical documentation, but this is the text"

---

[17]   As stated previously, the Skype logs obtained from Individual A reflect an instant message sent by Stojanovic on or about May 21, 2015 at approximately 9:13 AM CDT which stated "I send to my team to check."

a.    The review of the srbincar@gmail.com email contents found no indications that the above email message was subsequently sent to Individual A.

17.    Based on my communications with agents who conducted the interview and review of pertinent reports, I know that on or about July 24, 2015, an FBI agent interviewed Individual A regarding whether Individual A had received any further communications from Stojanovic. Individual A advised Individual A had not received any further communications from Stojanovic since on or about May 21, 2015. Individual A also advised that letters had been sent out to Company A's customers in late May 2015 to alert them to the fact that a potential data breach had occurred.

18.    According to the search warrant results, the email account srbincar@gmail.com was also found to contain an email sent on or about December 26, 2014, from nemo@lovefreightways.com to Stefan Stojanovic. The subject of the email message was "Aloha" and the body of the email listed the name "Nemo Lovre", "Love Freightways Inc," and the telephone number 714-414-2207 which the email indicates is a mobile telephone number. The header information included with this email message reflected that this email message was received by Google from an email server with the name "jenna.lovefreightways.com" which was assigned the IP address 74.62.172.18.

19.    The email account srbincar@gmail.com was also found to contain an email sent on or about April 23, 2015 from nemo@lovefreightways.com to Stefan Stojanovic. The body of the email listed the name "Nemo Lovre," the web site www.lovefreightways.com, and the telephone number 714-414-2207 which the email indicates is a mobile telephone number. This email also included a forwarded email received by nemo@lovefreightways.com in which the sender of the email is listed as Marko Stankovic. There was no content included in the forwarded email. The header information included with this email message reflected that this email message was received by Google from an email server with the name "jenna.lovefreightways.com" which was assigned the IP address 74.62.172.18.

20.    Based on my communications with the agent involved, I know that on or about September 11, 2015 at approximately 12:21 PM CDT, an FBI agent utilized publicly available tools to lookup the current mail exchange (MX) record for the domain lovefreightways.com. The MX for lovefreightways.com was found to be 74.62.172.18. [18]

21.    On or about September 15, 2015, subscriber records were provided by Time Warner Cable for the customer utilizing the IP address

---

[18] As stated previously, email header information reflected the emails from nemo@lovefreightways to srbincar@gmail.com sent on or about December 26, 2014, and on or about April 23, 2015, were both received by a Google email server from an email server with the name "jenna.lovefreightways.com" and which utilized the IP address 74.62.172.18.

74.62.172.18 on September 11, 2015 at 12:21 PM CDT. The provided records reflected the assigned customer was "LOVE FREIGHTWAYS" with the **Subject Premises** listed as the subscriber address. The activation date is listed as December 22, 2014 with the service listed as still active. The phone number listed for the account was 714-414-2207. The service is listed as being a commercial static IP address.

22. On or about September 25, 2015, an FBI agent again utilized publicly available tools to lookup the current mail exchange (MX) record for the domain lovefreightways.com. The MX record for lovefreightways.com was found to still be 74.62.172.18.

23. Based on my discussions with the agent involved in the communications, I know that on or about September 25, 2015, Individual B, an employee of Time Warner Cable, advised an FBI agent that there had been no change in the service address associated with the IP address 74.62.172.18 in the time since the records had been provided on September 15, 2015.

24. Based on my review of the documents themselves and communications with agents conducting financial investigation, I know that during the investigation, bank account records were obtained from JP Morgan Chase Bank N.A. for account number ending in 5523. The records reflected that the account was held in the name of Marko Stankovic, 3826

22

Broadlawn Dr, Los Angeles, CA 90068. Records for the account reflect a deposit on May 21, 2015 of a $40,000 cashier's check payable to MARKO STANKOVIC with a remitter listed as COMPANY A. Records for the account also reflect a June 9, 2015 debit of $25,000. The records included a scanned copy of a check drawn on account number ending in 5523 associated with this debit. The check is dated June 4, 2015, and is made out for $25,000 payable to the order of "CASH."

25.     I further know based on these sources that during the investigation, bank account records were also obtained from Bank of America N.A. for an account held in the name of Love Freightways, Inc, with an address of 501 N. Brookhurst St, Ste 206, Anaheim, CA 92801.    The signature card for the account, which is dated November 30, 2011, lists the signatory as Nemanja Lovre whose relationship to Love Freightways is listed as "owner."    The signature card lists Illinois driver's license number L16063383028 with an expiration date of January 28, 2014 as a form of identification for Nemanja Lovre. The telephone number associated with the account was 714-414-2207.[19] Records for the Bank of America account reflect a deposit on June 8, 2015 of a $25,000 check. The records included a scanned

---

[19] As stated previously, telephone number 714-414-2207 was listed as the mobile telephone number associated with "Nemo Lovre" in the email sent on or about April 23, 2015 from nemo@lovefreightways.com to Stefan Stojanovic as well as the telephone number listed in the Time Warner Cable subscriber information for IP address 74.62.172.18.

copy of the check which indicated it was from JPMorgan Chase Bank account number ending in 5523 held in the name of Marko Stankovic.[20]  The check is dated June 4, 2015 and pays the $25,000 to the order of "CASH."[21]

26.    Based on my discussion with the agent who conducted the review, I know that on or about September 15, 2015, an FBI agent reviewed the web site http://lovefreightways.com. The web site indicated that Love Freightways was a transportation logistics company with a listed business address of 501 N. Brookhurst St., Ste #206, Anaheim, CA 92801.

27.    I also know that this same FBI agent, on or about September 22, 2015, performed a business entity search for "Love Freightways" on the web site for the California Secretary of State. The search results reflected an entity named "LOVE FREIGHTWAYS, INC." with **the Subject Premises** listed as the address. The agent for the service of process was listed as "NEMENJA LOVRE" with **the Subject Premises** also listed as the agent address.

28.    On or about September 18, 2015, the same FBI agent (with whom I have worked with on the investigation), reviewed a publicly accessible LinkedIn profile for "Nemo Lovre" which listed Lovre as the president at

[20] As stated previously, JPMorgan Chase Bank account 632655523 was the bank account to which Individual A was instructed to deposit the $40,000 cashier's check.
[21] As stated previously, the bank receipt dated May 21, 2015 which reflected $40,000 being deposited to an account number ending in 5523 indicated that availability of $35,000 of the deposited amount would be delayed until June 2, 2015.

24

Love Freightways located in Anaheim, CA with a date range of June 2011 to the present listed. The profile also reflected that Lovre's educational experience included attending "William Howard Taft High School Chicago" from 1999 to 2003.

29. The same FBI agents has also informed me that the agent has reviewed State of Illinois driver's license records, which reflect a current driver's license issued to Nemanja Lovre, date of birth January 28, 1983, having the license number L16063383028 which was most recently issued on December 11, 2013.

30. From my discussions with other agents involved in the investigation, I also know that an FBI translator familiar with the Serbian language has advised an FBI agent involved with the investigation that "Nemo" could be used as an abbreviated version of Nemanja

31. Based on my communications with the agents involved in the surveillance operation, I know that on or about September 17, 2015, at approximately 10:30 AM, an FBI agent performed surveillance at 13668 Lakeland Road, Whittier, CA 90605, the **Subject Premises**. A vehicle observed in the street in front of the residence was a 2005 Toyota 4Runner bearing California license plate 6VIA956. California Department of Motor Vehicles records reflect this vehicle is registered to Love Freightways, 501 N. Brookhurst St. Ste. 206, Anaheim, CA 92801.

32.     From the same source, I know that on or about September 22, 2015, at approximately 6:00 AM, an FBI agent performed surveillance at the **Subject Premises**. Vehicles observed in the street in front of the residence included the 2005 White Toyota 4Runner bearing California license plate 6VIA956 as well as a 1999 Pontiac Grand AM bearing California license plate 6TRU322.    California Department of Motor Vehicles records reflect this vehicle is registered to Nemanja Lovre, 912 N Hampton Street, Anaheim, CA 92801.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES

33.     As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and

others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

    a.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

    b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

    c.    The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes,

is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

   d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or

viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e.    Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of

USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

      f.     Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

34.    For the reasons set forth above and based on my training and experience I believe that an off-site review of any digital devices found is necessary in order to fully search the devices for the items set forth in Attachment B.

35.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## CONCLUSION

36.    Based on the above information, I respectfully submit that there is probable cause to believe that evidence and instrumentalities of violations of the **Subject Offense** will be found at **the Subject Premises**. I respectfully request that the Search Warrant sought herein issue pursuant to Rule 41 of the Federal Rules of Criminal Procedure, permitting authorized agents or officers to enter **the Subject Premises** and therein to search for and seize the evidence, instrumentalities, and fruits of violations of federal law, including violations of Title 18, United States Code, §1030(a)(7) which evidence consists of the items set forth in Attachment B, attached hereto.


_____
Andrew Innocenti
Special Agent
Federal Bureau of Investigation


Subscribed and sworn
before me on September ___, 2015


_____
Honorable
United States Magistrate Judge